UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| MA- BBO FIVE, LP | § | CASE NO. 11-40644 |
| | § | |
| MA BB OWEN, LP | § | CASE NO.  11-40645 |
| | § | Chapter 11 |
| | § | |
| | § | |
| DEBTORS. | § | |

FIRST AMENDED DISCLOSURE STATEMENT
DATED JULY 12, 2011

Joyce Lindauer
Attorneys at Law
8140 Walnut Hill Lane
Suite 301
Dallas, Texas  75231
972/503-4033 (Joyce)

COUNSEL FOR DEBTORS AND
DEBTORS-IN-POSSESSION

# TABLE OF CONTENTS

ARTICLE I - INTRODUCTION .......................................................................... 3

ARTICLE II - REPRESENTATIONS ........................................................... 10

ARTICLE III - FINANCIAL PICTURE OF THE DEBTOR .................................... 11

ARTICLE IV - ANALYSIS AND VALUATION OF PROPERTY ........................... 24

ARTICLE V- SUMMARY OF THE PLAN ................................................... 26

ARTICLE VI – MEANS FOR IMPLEMENTATION OF PLAN…………............................... 35

ARTICLE VII – TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED

LEASES…. ......................................................................................... 35

ARTICLE VIII - FEASIBILITY OF PLAN ................................................. 36

ARTICLE IX - ALTERNATIVES TO DEBTOR'S PLAN ................................... 40

ARTICLE X - RISKS TO CREDITORS UNDER DEBTOR'S PLAN ..................... 40

ARTICLE XI - TAX CONSEQUENCES TO THE DEBTOR.................................... 41

ARTICLE XII - PENDING LITIGATION.................................................. 44

ARTICLE XIII - SUMMARY OF SIGNIFICANT ORDERS ENTERED DURING THE

CASE………………………………………………………………….…………………….. 45

EXHIBITS ....................................................................................................

    Financials ...............................................................Exhibit A & B

    Synopsis of Proforma Projections…………………………………………..Exhibit C

    Detailed Proforma Projections ........................................... Exhibit D

    Bank Cash Flow ...............................................................Exhibit E

Chapter 11 Plan……………………………… …………………………………..Exhibit F

Market Evaluation by Robert Charles Lesser & Company....……………………Exhibit G

Analysis of Intercompany Transactions…………………………………....…Exhibit H

Summary of Appraisals……………………………………………………….…Exhibit I

Summary of Ad Valorem Taxes……………………………………………....……Exhibit J

## ARTICLE I

### INTRODUCTION
### Identity of the Debtors

**1.01**     Debtors filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. Section 101, et seq. ("**Code**") on February 28, 2011 in the United States Bankruptcy Court for the Eastern District of Texas, Sherman Division ("**Court**"), initiating the above-styled and referenced bankruptcy proceeding. The **Debtors** are operating their businesses as a **Debtor-in-Possession** pursuant to Sections 1107 and 1108 of the **Code**. Debtors have elected to file a joint plan of reorganization.

### Purpose of This Disclosure; Sources of Information

**1.02**.     **Debtors** submits this Disclosure pursuant to Section 1125 of the **Code** to all known **Claimants** of **Debtors** for the purpose of disclosing that information which the **Court** has determined is material, important, and necessary for **Creditors** of, and the Members of, **Debtors** in order to arrive at an intelligent, reasonably informed decision in exercising the right to vote for acceptance or rejection of the **Debtors' Plan**.  A copy of the Plan is attached hereto as ***Exhibit "F"*** and incorporated herein by this reference. The Plan sets forth in detail the repayment arrangement between the Debtors and their creditors. This Disclosure describes the operations of the **Debtors** contemplated under the **Plan**. Any accounting information contained herein has been provided by the **Debtors** and has been prepared using the cash method of accounting.

### Explanation of Chapter 11

**1.03**     Chapter 11 is the principal reorganization chapter of the **Code**.   Pursuant to Chapter 11, a debtor is authorized to reorganize its business for its own benefit and that of its creditors and equity interest holders.   Formulation of a plan of reorganization is the principal purpose of a Chapter 11 reorganization case.   A plan of reorganization sets forth the means for satisfying claims against and interests in the debtor.  After a plan of reorganization has been filed, it must be accepted by holders of claims against, or interests in, the debtor.  Section 1125 of the **Code** requires full disclosure before solicitation of acceptances of a plan of reorganization.  This

Disclosure is presented to **Claimants** to satisfy the requirements of Section 1125 of the **Code**.

<u>**Explanation of the Process of Confirmation**</u>

 **1.04**  Even if all **Classes** of **Claims** accept the plan, its confirmation may be refused by the **Court**. Section 1129 of the **Code** sets forth the requirements for confirmation and, among other things, requires that a plan of reorganization be in the best interests of **Claimants**. It generally requires that the value to be distributed to **Claimants** and **Equity Interest Holders** may not be less than such parties would receive if the debtor were liquidated under Chapter 7 of the **Code**.

 **1.05**  Acceptance of the plan by the **Creditors** and **Equity Interest Holders** is important. In order for the plan to be accepted by each class of claims, the creditors that hold at least two thirds (2/3) in amount and more than one-half (½) in number of the allowed claims actually voting on the plan in such class must vote for the plan and the equity interest holders that hold at least two-thirds (2/3) in amount of the allowed interests actually voting on the plan in such class must vote for the plan. Chapter 11 of the **Code** does not require that each holder of a claim against, or interest in, the debtor vote in favor of the plan in order for it to be confirmed by the **Court**. The plan, however, must be accepted by: (i) at least the holder of one (1) class of claims by a majority in number and two-thirds (2/3) in amount of those claims of such class actually voting; or (ii) at least the holders of one (1) class of allowed interests by two-thirds (2/3) in amount of the allowed interests of such class actually voting.

 **1.06**  The **Court** may confirm the plan even though less than all of the classes of claims and interests accept it. The requirements for confirmation of a plan over the objection of one or more classes of claims or interests are set forth in Section 1129(b) of the **Code**.

 **1.07**  **Confirmation** of the plan discharges the debtor from all of its pre-confirmation debts and liabilities except as expressly provided for in the plan and Section 1141(d) of the **Code**. **Confirmation** makes the plan binding upon the debtor and all claimants, equity interest holders and other parties-in-interest, regardless of whether or not they have accepted the plan.

<u>**Voting Procedures**</u>

 **1.08**  <u>**Unimpaired Class**</u>. **Claimants** in Class 1 are not impaired under the **Plan**. Such Class, therefore, is deemed to have accepted the **Plan**.

 **1.09**  <u>**Impaired Classes**</u>. The Classes 2, 2A, 3, 3A, 4, 5, 5A, 6, 6A, 7, 7A, 8, 9, 10, 10A, 11, and 11A **Claimants** are impaired as defined by Section 1124 of the **Code**. The **Debtors** are seeking the acceptance of the **Plan** by **Claimants** in **Classes** 2, 2A, 3, 3A, 4, 5, 5A, 6, 6A, 7, 7A, 8, 9, 10, 10A, 11, and 11A. Each holder of an **Allowed Claim** in **Classes** 2, 2A, 3, 3A, 4, 5, 5A, 6, 6A, 7, 7A, 8, 9, 10, 10A, 11, and 11A may vote on the **Plan** by completing, dating and signing the ballot sent to each holder and filing the ballot as set forth below. The Class 12 Equity Holders

are also impaired but as insiders their votes do not count towards Confirmation. One ballot will be sent to each **Claimant** eligible to vote on the **Plan**.  For all **Classes**, the ballot must be returned to **Debtor**'s attorney, Joyce Lindauer, Attorney at Law, 8140 Walnut Hill Lane, Suite 301, Dallas, TX 75231.  In order to be counted, ballots must be **RECEIVED** no later than at the time and on the date stated on the ballot.

1.10 <u>Acceptances</u>.  Ballots that are signed and returned but fail to indicate either an acceptance or rejection will not be counted.

## <u>Best</u> <u>Interests</u> <u>of</u> <u>Creditors</u> <u>Test</u>

1.11 Section 1129(a)(7) of the **Code** requires that each impaired class of claims or interests accept the **Plan** or receive or retain under the **Plan** on account of such claim or interest, property of a value as of the **Effective Date** of the **Plan**, that is not less than the amount that such holder would so receive or retain if the **Debtor** were liquidated under Chapter 7 of the Bankruptcy **Code**.  If Section 1111(b)(2) of the **Code** applies to the claims of such class, each holder of a claim of such class will receive or retain under the **Plan**, on account of such claim, property of a value, as of the **Effective Date** of the **Plan**, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.  In order for the **Plan** to be confirmed, the **Court** must determine that the **Plan** is in the best interest of the **Debtor**'s creditors.  Accordingly, the proposed plan must provide the **Debtor**'s creditors with more than they would receive in a Chapter 7 liquidation. Accordingly, since the **Plan** proposes to pay all secured creditors in full and the unsecured creditors a dividend, Debtor believes that the creditors are receiving more than they would receive in a Chapter 7 liquidation. Without the continued operation of the Debtor's business there would be no funds to pay unsecured creditors. A liquidation analysis is provided in Section 13. Accordingly, the Debtor contends that the **Plan** satisfies the requirements of Section 1129(a)(7).

## <u>Cramdown</u>

1.12 The **Court** may confirm the **Plan** even though less than all of the classes of claims and interests accept it.  The requirements for confirmation of a plan over the objection of one or more classes of claims or interests are set forth in Section 1129(b) of the **Code**.  Accordingly, **Debtor**, as the plan proponent, requests the **Court** to determine that the **Plan** does not discriminate unfairly, and is fair and equitable with respect to any objecting creditor. A discussion of the specific requirements for Cramdown of a Plan are set forth starting  below.

## <u>Definition</u> <u>of</u> <u>Impairment</u>

1.13 As set forth in section 1124 of the Bankruptcy Code, a class of claims or equity interests is impaired under a plan of reorganization unless, with respect to each claim or equity interest of such class, the plan: leaves unaltered the legal, equitable, and contractual rights of the

holder of such claim or equity interest; or notwithstanding any contractual provision or applicable law that entitles the holder of a claim or equity interest to demand or receive accelerated payment of such claim or equity interest after the occurrence of a default: cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; reinstates the maturity of such claim or interest as it existed before such default; compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance on such contractual provision or such applicable law; and does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest.

## Classification and Treatment of Claims and Interests

**1.14**   The Plan classifies Claims separately in accordance with the Bankruptcy Code and provides different treatment for different classes of Claims.

**1.15**   Only holders of Allowed Claims are entitled to receive distributions under the Plan. Allowed Claims are Claims that are not in dispute, are not contingent, are liquidated in amount, and are not subject to objection or estimation.  Initial distributions or other transfers of Cash or other consideration specified in the Plan otherwise available to the holders of Allowed Claims will be made on the Effective Date, or (b) the date on which such Claim becomes an Allowed Claim), as otherwise provided in the Plan, or as may be ordered by the Bankruptcy Court.

**1.16**    In accordance with the Plan, unless otherwise provided in the Plan or the Confirmation Order, the treatment of any Claim under the Plan will be in full satisfaction, settlement, release, and discharge of and in exchange for each and every Claim.

## Requirements for Confirmation of the Plan

**1.17**    At the confirmation hearing, the Bankruptcy Court must determine whether the Bankruptcy Code's requirements for confirmation of the Plan have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan.  As set forth in section 1129 of the Bankruptcy Code, these requirements are as follows:

> The plan complies with the applicable provisions of the Bankruptcy Code.
> The proponents of the plan comply with the applicable provisions of the Bankruptcy Code.
> The plan has been proposed in good faith and not by any means forbidden by law.
> Any payment made or promised by the Debtor, by the plan proponents, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in, or in connection with, the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of the Bankruptcy Court as reasonable.
> (A)    The proponent of the plan has disclosed the identity and affiliations of any individual

proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the Debtor, an affiliate of the Debtor participating in a joint plan with the Debtor, or a successor to the Debtor under the plan; and

(B)     the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized Debtor, and the nature of any compensation for such insider.

Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the Debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

With respect to each impaired class of claims or interests:

(I) each holder of a claim or interest of such class has (A) accepted the plan or (B) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the Debtor were liquidated on such date under chapter 7 of the Bankruptcy Code on such date; or (ii) if section 1111(b)(2) of the Bankruptcy Code applies to the claims of such class, the holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

With respect to each class of claims or interests:

(i)     such class has accepted the plan; or
(ii)     such class is not impaired under the plan.

Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that:

(i)     with respect to a claim of a kind specified in section 507(a)(1) or 507(a)(2) of the Bankruptcy Code, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(ii)     with respect to a class of claims of a kind specified in section 507(a)(3), 507(a)(4), 507(a)(5) or 507(a)(6) of the Bankruptcy Code, each holder of a claim of such class will receive: (I) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and

(iii)     with respect to a claim of a kind specified in section 507(a)(7) of the Bankruptcy Code, the holder of a claim will receive on account of such claim deferred

cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claim.

If a class of claims is impaired under the plan, at least one class of claims that is impaired has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim of such class.

If the debtor is required by a judicial or administrative order, or by statute, to pay a domestic support obligation, the debtor has paid all amounts payable under such order or such statute for such obligation that first become payable after the date of the filing of the petition.

Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on confirmation of the plan, have been paid or the plan provides for the payments of all such fees on the effective date of the plan.

The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114, at any time prior to confirmation of the plan, for the duration of the period the Debtor has obligated itself to provide such benefits.

The Debtor believes that the Plan satisfies all the statutory requirements of chapter 11 of the Bankruptcy Code, that the Debtor has complied with or will have complied with all the requirements of chapter 11, and that the Plan is proposed in good faith.

At the Confirmation Hearing, the Bankruptcy Court will determine whether holders of Allowed Claims or Allowed Equity Interests would receive greater distributions under the Plan than they would receive in a liquidation under chapter 7.

The Debtor believes that the feasibility requirement for confirmation of the Plan is satisfied by the fact that the future operating revenues will be sufficient to satisfy the obligations under the Plan in addition to supporting sustainable growth of the enterprise. These facts and others demonstrating the confirmability of the Plan will be shown at the Confirmation Hearing.

## <u>Cramdown</u>

**1.18**     The bankruptcy court may confirm a plan of reorganization even though fewer than all the classes of impaired claims and interests accept it. For a plan of reorganization to be confirmed despite its rejection by a class of impaired claims or interests, the proponents of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or interests that has not accepted the plan.

**1.19**    "Fair and equitable" has different meanings with respect to the treatment of secured and unsecured claims.  As set forth in section 1129(b)(2) of the Bankruptcy Code, those meanings are as follows:

With respect to a class of **secured claims**, the plan provides:

(a)(i) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the Debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(ii)  that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(b)  for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (a) and (b) of this subparagraph; or

(c)  the realization by such holders of the "indubitable equivalent" of such claims.

With respect to a class of **unsecured claims**, the plan provides:

(a)  that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(b)  the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

With respect to a class of **interests**, the plan provides:

(a)  that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest; or

(b)  that the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

**1.20**       In the event that one or more classes of impaired Claims reject the Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable with respect to, and does not discriminate unfairly against, any rejecting impaired class of Claims. SO LONG AS THE CLASSES OF UNSECURED CREDITORS VOTE FOR THE PLAN THEN THE PLAN WILL NOT VIOLATE THE ABSOLUTE PRIORITY RULE. The absolute priority rule requires that prior to the Debtor retaining or receiving any property the senior classes of claims must be paid in full or vote to accept the Plan. The Debtor has built an

auction process of the Equity into the Plan to address the absolute priority rule issue in this case should the unsecured creditors not accept the Plan. Hillcrest and Heritage Banks are being treated as fully secured under the Plan.

The Debtor believes the Plan does not discriminate unfairly against, and is fair and equitable with respect to, each impaired class of Claims.

## ARTICLE II.

## <u>REPRESENTATIONS</u>

2.01    This Disclosure is provided pursuant to Section 1125 of the **Code** to all of the **Debtor**'s known **Creditors** and other parties in interest in connection with the solicitation of acceptance of its **Plan** of reorganization, as amended or modified. The purpose of this Disclosure is to provide such information as will enable a hypothetical, reasonable investor, typical of the holders of **Claims**, to make an informed judgment in exercising its rights either to accept or reject the **Plan**.

2.02    The information contained in this Disclosure has been derived from information submitted by the **Debtor**, unless specifically stated to be from other sources.

2.03    No representations concerning the **Debtor** are authorized by the **Debtor** other than those set forth in this Disclosure. The **Debtor** recommends that any representation or inducement made to secure your acceptance or rejection of the **Plan** which is not contained in this Disclosure should not be relied upon by you in reaching your decision on how to vote on the **Plan**. Any representation or inducement made to you not contained herein should be reported to the attorneys for **Debtor** who shall deliver such information to the **Court** for such action as may be appropriate.

2.04    ANY BENEFITS OFFERED TO THE CREDITORS ACCORDING TO THE PLAN WHICH MAY CONSTITUTE "SECURITIES" HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION ("SEC"), THE TEXAS SECURITIES BOARD, OR ANY OTHER RELEVANT GOVERNMENTAL AUTHORITY IN ANY STATE OF THE UNITED STATES. IN ADDITION, NEITHER THE SEC, NOR ANY OTHER GOVERNMENTAL AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE OR UPON THE MERITS OF THE PLAN. ANY REPRESENTATIONS TO THE CONTRARY MAY BE A CRIMINAL OFFENSE.

2.05    THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. FOR THE FOREGOING REASON, AS WELL AS BECAUSE OF THE IMPOSSIBILITY OF MAKING ASSUMPTIONS, ESTIMATES AND PROJECTIONS

INTO THE FUTURE WITH ACCURACY, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS COMPLETELY ACCURATE, ALTHOUGH EVERY REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT SUCH INFORMATION IS ACCURATE.  THE APPROVAL BY THE COURT OF THIS DISCLOSURE DOES NOT CONSTITUTE AN ENDORSEMENT BY THE COURT OF THE PLAN OR GUARANTEE THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

2.06    THE DEBTOR BELIEVES THAT THE PLAN WILL PROVIDE CLAIMANTS WITH AN OPPORTUNITY ULTIMATELY TO RECEIVE MORE THAN THEY WOULD RECEIVE IN A LIQUIDATION OF THE DEBTOR'S ASSETS, AND SHOULD BE ACCEPTED.  CONSEQUENTLY, THE DEBTOR URGES THAT CLAIMANTS VOTE FOR THE PLAN. IN A LIQUIDATION IT IS LIKELY HILLCREST AND HERITAGE BANKS WOULD FORECLOSE ON THE PROJECT LEAVING ANY INFERIOR CLAIMANTS UNPAID.

2.07    DEBTOR DOES NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS CORRECT, ALTHOUGH GREAT EFFORT HAS BEEN MADE TO BE ACCURATE.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN.

## ARTICLE III.

## FINANCIAL PICTURE OF THE DEBTOR

### Financial History and Background of the Debtor

**History**

3.01 MA BB Owen, L.P. and MA-BBO Five, L.P.

In June 2006, Marlin Atlantis, a Dallas, Texas based commercial real estate developer, sponsored the original acquisition of 1,115 acres of land (the "Property") in the extraterritorial jurisdiction ("ETJ") of the City of McKinney, Texas ("City").  The Property is located west of Interstate 75 and approximately 4-miles north of the City.  The Property is characterized by pristine rolling terrain adjacent to the east fork of the Trinity River and remains well positioned for a future master planned community.

Marlin Atlantis, via a single purpose entity, MA BB Owen, L.P. ("Buyer"), acquired the option to purchase the land from Trent Horton ("Seller") on June 15, 2006.  Seller had executed purchase contracts with numerous sellers of land comprising the Property.  Seller provided financing which was financed out with a $22,800,000 loan from Hillcrest Bank

on December 15, 2006.

In September 2006, Marlin Atlantis, a Dallas, Texas based commercial real estate developer, sponsored the acquisition of 592 acres of land (the "Property II") adjacent to the Property.

Marlin Atlantis, via a single purpose entity, MA-BBO Five, L.P. ("Buyer II"), acquired the option to purchase the land from ("Seller") utilizing a $11,071,769 loan from Heritage Bank.

Hillcrest Bank, N.A. ("Hillcrest") alleges that the Disclosure Statement as filed does not contain adequate information.

Hillcrest disputes that the Claims against the Debtors are appropriately classified, treated, designated as impaired or not, and designated as having the right to vote or not. All issues regarding classification, treatment, impairment and voting are reserved for confirmation without regarding to statement made herein. Hillcrest claims the Plan is flawed as it discriminates unfairly, is not fair and equitable and violates the absolute priority rule. Hillcrest also claims the unsecured creditor class is manipulated for voting purposes, the plan seeks substantive consolidation, and the Plan is not feasible. Further, Hillcrest claims the Plan violates a pre-petition subordination agreement. Hillcrest also claims the Plan provides for a release of non-debtor guarantors and/or an injunction against Hillcrest's pursuit of its remedies against the guarantors under the relevant guaranty agreements. The Debtors address each of these issues in this Modification.

Hillcrest disagrees with and disputes many of the statements made by the Debtors in this Disclosure Statement. Approval, mailing, and use of this Disclosure Statement for solicitation, is not a Court determination, finding, or conclusion regarding the correctness of the legal or factual statements within the Disclosure Statement. All issues with respect to confirmation of the Plan are preserved and unaffected by the approval and use of the Disclosure Statement. The Disclosure Statement and its exhibits shall not be admissible as evidence for the truth of the factual or legal statements made therein.

Hillcrest requests information on what led to the Chapter 11 filing. Debtor alleges that the Chapter 11 filing was due to Hillcrest sweeping over $2,900,000 from the Debtor's bank account which left it without cash to commence its development project. Debtor alleges that Hillcrest knew that this single event forced the filing because had the Debtor had these funds available it would have been able to service the debt and commence its development project.

The obligations under the pre-petition subordination agreements are discussed as follows:

- Heritage Land Bank, ACA, Hillcrest Bank and Tri-Properties, Ltd. entered into a

pre-petition Subordination and Standstill Agreement (MA-BBO Five, LP Tract) with PREP BB Owen, LLC and consented to by MA-BBO Five, Ltd. dated January 8, 2009. This agreement allowed the making of a subordinate loan. As a result of the making of such a loan and lien the Subordinate Lender granted certain rights to the Senior Lenders. Whatever rights and obligations may exist between these parties shall remain as between themselves potentially unaffected, however, as to their rights as against the Debtors they may be affected by such obligations and rights in their Plan.

- Heritage Land Bank, ACA, Hillcrest Bank and Tri-Properties, Ltd. entered into a pre-petition Subordination and Standstill Agreement (MA-BBO Five, LP Tract) dated April 20, 2007. This agreement allowed the making of a subordinate loan. As a result of the making of such a loan and lien the Subordinate Lender granted certain rights to the Senior Lenders. Whatever rights and obligations may exist between these parties shall remain as between themselves potentially unaffected, however, as to their rights as against the Debtors they may be affected by the obligations and rights in their Plan.

- Heritage Land Bank, ACA, Hillcrest Bank and MA BB Owen, LP and MA-BBO Five, LP entered into a pre-petition Subordination and Standstill Agreement dated December 15, 2006. This agreement allowed the making of a subordinate loan. As a result of the making of such a loan and lien the Subordinate Lender granted certain rights to the Senior Lenders. Whatever rights and obligations may exist between these parties shall remain as between themselves potentially unaffected, however, as to their rights as against the Debtors they may be affected by the obligations and rights in their Plan.

- Heritage Land Bank, ACA, Hillcrest Bank and Tri-Properties, Ltd. entered into a pre-petition Subordination and Standstill Agreement (MA BB Owen, LP Tract) dated April 20, 2007. This agreement allowed the making of a subordinate loan. As a result of the making of such a loan and lien the Subordinate Lender granted certain rights to the Senior Lenders. Whatever rights and obligations may exist between these parties shall remain as between themselves potentially unaffected, however, as to their rights as against the Debtors they may be affected by the obligations and rights in their Plan.

- Hillcrest Bank and Tri-Properties, Ltd. and PREP BB Owen, LLC entered into a pre-petition Amended and Restated Subordination and Standstill Agreement dated June 23, 2009. This agreement allowed the making of a subordinate loan. As a result of the making of such a loan and lien the Subordinate Lender granted certain rights to the Senior Lenders. Whatever rights and obligations may exist between these parties shall remain as between themselves potentially unaffected, however, as to their rights as against the Debtors they may be affected by the obligations and

rights in their Plan.

- Heritage Land Bank, ACA, Hillcrest Bank and Tri-Properties, Ltd. and PREP BB Owen, LLC entered into a pre-petition Amended and Restated Subordination and Standstill Agreement dated June 23, 2009. This agreement allowed the making of a subordinate loan. As a result of the making of such a loan and lien the Subordinate Lender granted certain rights to the Senior Lenders.  Whatever rights and obligations may exist between these parties shall remain as between themselves potentially unaffected, however, as to their rights as against the Debtors they may be affected by the obligations and rights in their Plan.

- Hillcrest Bank and Tri-Properties, Ltd. and PREP BB Owen, LLC entered into a pre-petition Subordination and Standstill Agreement dated January 3, 2009. This agreement allowed the making of a subordinate loan. As a result of the making of such a loan and lien the Subordinate Lender granted certain rights to the Senior Lenders.  Whatever rights and obligations may exist between these parties shall remain as between themselves potentially unaffected, however, as to their rights as against the Debtors they may be affected by the  obligations and rights in their Plan.

- Hillcrest has indicated that it intends to assert its rights to vote certain claims for Tri-Properties, Ltd. and PREP BB Owen, LLC as provided for in the subordination agreements described above.

- There is no release of third party guarantors under the Plan nor any injunction or stay preventing Hillcrest from pursuing its contractual and/or legal rights and remedies against the guarantors. To the extent that any provision is read to create such a release or injunction, that provision is edited to remove any implication of a third party guarantor release or injunction.  However, the Debtor alleges that the property securing Hillcrest's secured claim is worth more than the amount owed to Hillcrest creating no deficiency under the Plan as proposed.

The information contained in the Disclosure Statement comes from the following sources:

- Marlin Atlantis White
- Castle Hill in the form of offers to Hillcrest and Heritage Bank in their possession
- Hillwood Development.  Hillwood synopsis
- Development Agreement with City of Mckinney
- Robert Charles Lesser & Company Market Evaluation
- Jacobs Engineering, Cost Estimates
- Kimly Horn Engineering, Cost Estimates
- RBC Capital Markets. MUD Financial Forecast

3.02  Hillcrest Loan

Hillcrest Bank Loan Agreement ("Hillcrest Loan Agreement") between Hillcrest and Buyer was executed on December 15, 2006.  Loan amount of $22,800,000 was used to acquire Property. Loan details are as follows:
- December 15, 2008 maturity
- 6%, interest only, paid monthly

On January 8, 2009, a Renewal, Extension and Modification Agreement to the Hillcrest Loan Agreement ("Hillcrest Renewal Agreement") was signed, which extended the Hillcrest Loan Agreement as follows (significant changes only):
- Extended maturity from December 15, 2008 to June 15, 2009 with an automatic 1-year extension through June 15, 2010 so long as Buyer paid a 1.25% extension fee
- Buyer to fund $2,000,000 principal reduction in advance by January 31, 2009
- Buyer to fund $3,600,000 interest reserve in advance by June 15, 2009
- Buyer to fund $1,400,000 principal reserve in advance by June 15,2009

In January Hillcrest claiming a technical default against Buyer swept the entirety of Buyer's pre-funded interest and principal reserves totaling $2,900,000 which would have funded interest to June 15, 2012.

3.03  Heritage Loan

Heritage Land Bank, ACA Loan Agreement ("Heritage Loan Agreement") with Buyer II was executed on September 15, 2006.  Loan amount of $11,071,769 was used to acquire Property II.  Loan was advanced in two installments of $7,381,085 and $3,690,684, the first being on the Closing Date and the second occurring thereafter. Loan details are as follows:
- October 1, 2011 maturity

- 6%, interest only payable on a quarterly basis on $7,381,085 loan
- 6%, interest only payable on a quarterly basis on $3,690,684 loan
- Principal reductions equal to 5% of principal balance due October 1, 2009 and October 1, 2010

On December 7, 2006, an amendment to the Heritage Loan Agreement ("Amendment No. 1") was signed, which amended the Heritage Loan Agreement as follows (significant changes only):
- Allowed for the $3,690,684 loan advance to be advanced no later than July 15, 2007 versus December 31, 2006 as provided in Heritage Loan Agreement

On April 20, 2007 an amendment to the Heritage Loan Agreement ("Amendment No. 2") was signed, which amended the Heritage Loan Agreement and Amendment No. 1 as follows (significant changes only):
- Acknowledged the $2,094,218.55 loan ("Bridge Loan") from Tri-Properties, Ltd. dated April 17, 2007 which was secured by the land yet subordinate to the Heritage and Hillcrest Loans

On October 31, 2008 an amendment to the Heritage Loan Agreement ("Amendment No. 3") was signed, which amended the Heritage Loan Agreement and Amendments No. 1 and 2 as follows (significant changes only):
- None

On October 1, 2009 an amendment to the Heritage Loan Agreement ("Amendment No. 4") was signed, which amended the Heritage Loan Agreement and Amendments No. 1, 2 and 3 as follows (significant changes only):
- Borrower to deposit $851,778 prior to November 13, 2009 for quarterly interest due to Heritage in 2010
- Principal payment due October 1, 2009 is waived


**Financials**

3.04 Financials for both companies are attached hereto as Exhibits "_A_" and "_B_".

**<u>Future Income and Expenses Under the Plan</u>**

**Projections**

3.05.   The Proforma projections for the future operations of the project is explained in summary form as follows:

The Proforma projection is an analytical presentation of the strategy for development and sale of the property.  It synthesizes data accumulated from various credible, independent

third-party professionals, all with extensive experience in the design, development, and delivery of successful Master Planned Communities such as the one envisioned for Trinity Falls. From this data, the Proforma generates a series of cash flows that can be used to analyze the long-term profitability and financial returns for the Trinity Falls project. The Executive Summary shown in Section 1 provides an overview of the revenues, costs, net cash flows, and other key points of the financial analysis. The details that support these conclusions are described in greater detail, below. Further, a synopsis of the primary results and assumptions that underlie the Proforma are included as Exhibit "C" hereto.

Robert Charles Lesser & Company, a national leader in the preparation of market analyses for Real Estate and Master Planned Communities, prepared a market study specifically for the Trinity Falls development. This market study, dated October 20, 2010, is attached hereto as Exhibit "G". This study identifies, in detail:

- Current economic and market conditions
- Current and projected lot inventory
- Demand for housing in the McKinney submarket
- Price points, neighborhood types, product type and mix explicitly recommended for the Trinity Falls project
- Anticipated sales velocities for each product type
- Delivery timing for the Trinity Falls development

The study results were used to develop the lot cost structure, timing, and phasing that are the backbone of the Proforma. These results were utilized to prepare a Land Use Plan as a guide for the optimized phased development of the project. The acreage to be devoted to each land use type is summarized in Exhibit "D", Section 2, Land Use Summary. This information is further used to determine the anticipated release of land from the Notes for the orderly development of the project. In conjunction with the Market Study, the land use, phasing, onsite and offsite utility requirements, community structure, and community amenities are further defined by a Development Agreement executed with the City of McKinney on December 5, 2006.

Once the backbone of product type, demand, and sales absorptions are assimilated, professional engineers are engaged to estimate the cost of design and construction for the entirety of improvements required to deliver the community. Detailed costs estimates for the project were prepared by Jacobs, Inc. and Kimley/Horn, Inc., two nationally-recognized engineering firms with extensive experience in the design and development of mixed-use communities. These estimates are summarized in Section 11 of Exhibit "D", and presented in greater detail in Sections 4 and 5. The cost estimates reflect the total anticipated expenditures for all project development costs, including those "offsite" costs (i.e., projects that occur outside the boundary of the property) that are required by the Development Agreement with the City of McKinney. Further, the cost estimates are

segregated to match project phasing derived from the Market Study, as described above, as well as phasing restrictions from the City's Development Agreement.

A third major component of the Proforma is reimbursable expenses projected to be received from McKinney Municipal Utility District No. 1 and McKinney Municipal Utility District No. 2 (collectively, the "MUDs"). These MUDs are political subdivisions of the State of Texas, created by the developer following the procedures established by the Texas Commission on Environmental Quality. The MUD has the obligation to provide water, wastewater, drainage, and roadway infrastructure to the community. The developer will construct these improvements, then be reimbursed over time as the development within the MUD's accumulate adequate assessed value to support the sale of MUD Bonds. Section 12 of Exhibit "D" details the anticipated growth of value within the community and the subsequent sale of bonds and reimbursement of funds to the developer.

Section 6 is a detailed composite cash flow schedule which summarizes all sources of revenues and costs, including financing and project overhead. Section 7 further focuses the cash flow schedule to provide a monthly composite of the development partners' individual cash flows through the anticipated completion of the project. Section 8 further synthesizes the partner cash flows into an annualized format.

Sections 9 and 10 provide a supplementary review of revenue and land use data.

Section 13 summarizes the costs associated with the requirements to provide Emergency Services to the community, as defined within the City of McKinney Development Agreement for Trinity Falls.

The $4,000,000 equity investment will be used to exit from bankruptcy and fund the payments needed on plan confirmation, to begin design and engineering for the initial phases of the project and to make sure debt service is covered as called for by the Plan.

The proforma has been revised to remove the $0 takedown/release cost for the 100.5 acres in phase 1a and now reflects a payment of $12,500/acre to the Banks.

3.06. Bank cash flow is attached hereto as Exhibit E.

The Plan as proposed is not substantively consolidating the two cases. Rather the plan treats the Debtors together as a joint plan because the tracts are being developed together.

Our plan does not distinguish between the two tracts as separate development projects. The tracts are contiguous to one another in forming the total 1,700 acre development. The market studies, the Development Agreement with the city of McKinney and the Utility Districts have always treated the Trinity Falls development as one 1,700 acre contiguous project. The logic behind this approach is that ultimately the final development scenario

will be driven by the most cost effective delivery to market and by market demand itself for specific housing product. The logistics of how the various tracts physically layout would not make it feasible to generate a development plan that separated the phasing according to which Bank held the loan on which tract of land. An approach of this nature would most certainly have an impact on overall project cost and could negatively affect the viability of delivering the project to market in a competitive manner.

There is no dividend for Hillcrest's unsecured claim because under the Debtors' Plan there is no Hillcrest unsecured claim. Hillcrest is treated as fully secured under the Plan.

The interest rate selected by the Debtor is commercially reasonable for this type of loan because: The strength of Hillwood and its track record in developing master plan communities mitigates the risk to the creditors substantially. The entitlements including the $10,000,000 funded by the BB Owen Trust to improve the 250 acre park as well as the forecasted $167,885MM in Utility District reimbursements will give Trinity Falls the market advantage and mitigate the risks.

The plan does not contain negative amortization. The plan does have a long amortization and a balloon payment.

The collateral release provisions are discussed in greater detail as follows:

The release schedule for land is based upon a release price of $12,500 per acre, as outlined in Exhibit "E" to the Plan. The acreages and timing for released are based upon the preliminary land plan and phasing and will be adjusted as the development proceeds based upon market requirements. Using the Plan's proforma phasing and acreage, the releases are projected to occur as outlined below:

- Phase 1a Land (approximately 100.5 ac) is released in 2012 for development for an anticipated release payment of $1,256,441.
- Phase 1b Land (approximately 79.6 ac) is released in 2013 for development for an anticipated cost of $995,352
- Phase 2 Land (approximately 201.2 ac) is released in 2014 for an anticipated payment of $2,514,645
- Phase 3 Land (approximately 226.2 ac) is released in 2015 for an anticipated payment of $2,827,273
- Phase 4 Land (approximately 254.7 ac) is released in 2017 for an anticipated payment of $3,183,828
- Phase 5 Land (approximately 258.7 ac) is released in 2018 for development for an anticipated cost of $3,233,299
- Phase 6 Land (approximately 250.2 ac) is released in 2019 for an anticipated payment of $3,127,530
- Phase 7 Land (approximately 162.1 ac) is released in 2021 for an anticipated

payment of $2,026,729
- Phase 8 Land (approximately 174.6 ac) is released upon payoff of the loan in 2021 (month 120)

Payments will be applied as follows:
- Monthly Interest at the rate of 2.5% per annum will be paid jointly to the Banks (estimated to be a total of $4.6MM paid during the 10-year repayment program).
- An Additional Interest Accrual of 2.5% will be accumulated during the 10-year repayment schedule and paid as a single balloon payment at the conclusion of the 10-year payoff plan (estimated to be a total of $4.6MM).
- A monthly Amortization Principal Payment based upon 2.5% interest per annum and a 40 year amortization rate will be paid jointly to the Banks (estimated to be $7.1MM during the 10-year payoff cycle).
- A Lien Release Principal Payment will be made as each Phase is released for development, as described in detail in question 16, above. These payments are estimated to total $19.2MM.
- A Principal Balloon Payment will be made in month 120 to pay off any remaining principal, predicted to be $3.4MM.

These cash flows are summarized in Exhibit "E" of the Plan.

The method of sharing or distribution of these payments between the Banks will likely be based upon the pro-rata share of the existing principal payments at the time of receipt of each payment under the plan, and will vary based upon the release of collateral and repayments of principal that occur during the process of development of the property.

To assist Hillcrest and Heritage Banks, Exhibit "K" is attached to define the first lien positions of each Bank relative to the Land Plan. To further assist Hillcrest and Heritage Banks in understanding the proposed Land Use and proposed Phasing of the property, Exhibit "L" is attached with a graphic Land Plan and Phasing Plan from the Development Agreement with the City of Mckinney.

The Debtors allege that the Plan does not violate the absolute priority rule because the unsecured creditors will be paid in full by the Debtors prior to any payment to the equity.


3.07. The proposed New Capital Partner is Hillwood.

How will the Plan be funded? The Exit Plan will be funded by the $4MM cash infusion from Hillwood at plan confirmation. The Development will be funded by Hillwood, its partners including debt from banks. Neither Hillwood nor any bank has signed any written commitment(s) to fund this project or the proposed reorganization set forth in the

Plan.

What other financial options did the Debtors consider? The Debtors looked for other financial partners but felt Hillwood was the strongest partner for this project. Hillwood's involvement with the Plan is as follows: Hillwood has been participating in this plan for the last 10 weeks. They have performed a tremendous amount of due diligence and are prepared to move forward. The Debtors have concurrently pursued cash offers which the Banks have in hand.

Hillwood has its own financial strength described as follows: Although Hillwood, a Perot company, is consistently ranked among the top developers in the country by national trade publications and has received awards from several prestigious real estate trade organizations, the company is best known for its large, signature projects that have made a significant impact on the community and become premier places for its residents and customers to live and conduct business.

The best evidence of Hillwood's ability to develop a tremendous business environment is that close to 90 companies from either the Fortune 500, Global 500 or Forbes List of Top Private Companies have chosen to locate in Hillwood's developments.

These companies represent a wide range of industries, including automotive (General Motors, Chrysler, Ford, Daimler, Hyundai, BridgestoneFirestone, Pep Boys), pharmaceutical/medical suppliers (Medline, AmerisourceBergen, Teleflex Medical, U.S. Oncology, Cardinal Health), retailers (Best Buy, Michaels, Home Depot, Garden Ridge, J.C. Penney, Kohl's, Safeway, Stater Bros.), consumer products (General Mills, Conair, Helen of Troy, Nestle, Coca-Cola, Behr Paints, Premium Waters, Benjamin Moore, Mattel), 3rd party logistics (Ryder, UPS, Exel, DSC Logistics, CEVA Logistics, Shippers Warehouse, Keuhne + Nagel), telecommunications/electronics (AT&T, ATC Logistics & Electonics, Motorola, LG Electronics, Q-Edge) and financial services/insurance (TDAmeritrade, AIG, Citigroup, Fidelity Investments).

In its residential communities, Hillwood also has worked with top homebuilders, including Centex, D.R.Horton, Pulte, Lennar, Hovnanian Enterprises, Toll Brothers and Beazer Homes.

As a developer, owner and property manager, Hillwood has introduced services that have added value and helped save costs for the companies and homeowners within its developments. These include Foreign Trade Zone expertise, employment and job training services, customs facilitation, advanced technology, customer group meetings to share human resources/facility management/security knowledge, livestock management, extensive landscaping and maintenance services, transportation initiatives, government relations, community Intranet, and Triple Freeport.

Hillwood's public partners also have realized a significant return. At its founding project, AllianceTexas, Hillwood has attracted 220 companies that have created 28,000 jobs and built more than 31 million square feet since 1990. An initial public investment of approximately $100 million from the city of Fort Worth, the state of Texas and the Federal Aviation Administration has already yielded $6.8 billion in private investment and more than $730 million in property tax revenue, including an annual total of $105 million in property taxes in 2008.

In 2000 Hillwood was named the master developer of the former Norton Air Force Base in San Bernardino, California. At that time the project had seen no significant development since 1994, when the Air Force turned the base over to the city. In less than a year, Hillwood was able to attract a 600,000 square-foot distribution center for Kohl's Department Stores to the development, which is now known as AllianceCalifornia. New major facilities for global leading companies Mattel, Pep Boys, Stater Bros., Kohler, Pactiv and Medline soon followed.

Hillwood has expertise with as diverse a product type as any real estate company in the world.

- Office - Hillwood has developed and manages offices for some of the world's most recognized companies. These include Daimler, Aviall, Galderma, Textron, DynCorp International, Bell Helicopter, Chrysler and the FAA. Since 2006, more than 2 million square feet of office space have been added at Hillwood's AllianceTexas development. This includes the 600,000 square-foot building that Fidelity Investments recently added at its 300-acre corporate campus at Circle T Ranch, where Deloitte recently began construction on its $300 million learning and leadership development center. In addition Hillwood developed the 20-story One Victory Park, which houses Ernst & Young, Haynes & Boone and Plains Capital Bank. It is the first registered multi-tenant LEED office building in Dallas.

- Airports - In the late 1980s, Hillwood led the effort in a public-private partnership to design, fund and develop Fort Worth Alliance Airport, the world's first industrial airport. Based on that project, the Federal Aviation Administration created a category for industrial airports, which were defined as a Class A airport dedicated to air cargo and aerospace manufacturing and training with no commercial passenger traffic. The airport was constructed in an unprecedented 18 months and is the centerpiece of the 17,000-acre Alliance Texas development that has attracted more than $6.8 billion in private investment.

- Remediation/Brownfield Development - In 1998 Hillwood began a year-long remediation of a blighted 75-acre urban tract near downtown Dallas. The site formerly held a rail yard, a power generating plant, a landfill, several dilapidated warehouses and a grain silo. It is now called Victory, a new district for the downtown area. Hillwood's AllianceCalifornia project, which is the redevelopment of the former Norton Air Force Base, also required a significant amount of remediation. The site of Interchange Business Center in San Bernardino, Calif. also required extensive remediation due to former manufacturing uses. That cleanup was a big factor in the project receiving LEEDSilverCertification.

- Single-Family Residential - Hillwood has been an innovator in the development of single-family communities since the late 1980s. The company has introduced several marketing, management and quality of life features that have distinguished its residential developments. Hillwood currently is developing communities in North Texas, Houston, Austin, Hawaii, Wyoming andCostaRica.

- Mixed-Use - Hillwood has significant experience in the extensive planning and complex coordination required in mixed-use development. In an urban environment, Hillwood developed the 75-are Victory mixed-use district near downtown Dallas. An example of the company's suburban mixed-use development is its 300-acre Alliance Town Center in north Fort Worth, Texas.

- Multifamily - In addition to the urban high-rise apartment homes and condominiums at Victory, Hillwood has experience developing multifamily product in suburban areas. The finest example of the quality of Hillwood's multifamily product is Monterra Village, which is the first 100% smoke-free luxury apartment home community in North Texas and features a 45-acre greenbeltand6,500square-footclubhouse.

- Arenas - In 2001 Hillwood completed development of the $420 million American Airlines Center, which serves as the home for the Dallas Mavericks of the National Basketball Association and the Dallas Stars of the National Hockey League. Hillwood also led the effort to form the public-private partnership that was vital to the arena being built. American Airlines Center is the centerpiece of Victory, the 75-acre master-planned district near downtown Dallas.

- High-Rise Hotel/Residences - Hillwood developed the W Dallas Victory Hotel and Residences, which is the first high-rise hotel with condominium residences under the W Hotel flag. Hillwood also is involved in a partnership thatdevelopedtheHotelPalomar-Atlanta.

- Golf Courses/Communities - Hillwood has partnered with several leading golf course developers and operators to create some of the country's top golf courses and golf course communities. Hillwood and Discovery Land Company are partners in Spanish Oaks near Austin. The two companies also worked together at Circle T Ranch to develop Vaquero, which has been ranked as the top golf course in Texas by the *Dallas Morning News*. Hillwood's Lost Canyons Golf Club in Simi Valley, California is managed by Landmark National. Hillwood also is a joint venture partner with Heritage Golf Group in Meadowbrook Farms in Houston.

## ARTICLE IV.

## ANALYSIS AND VALUATION OF PROPERTY

### Real Property

4.01  The Debtor has prepared this Analysis based on its opinion of the value of the assets and it matches the numbers used in its Schedules filed with this Court.  At the time the schedules were filed with the court the appraised values were as follows:

MA-BBO Five, LP Property   Value $17,100,000.00
MA BB Owen, LP Property   Value $22,350,000.00

Heritage points out that the Debtor has listed various assets but has not specifically defined such assets: See response below.

a.  Real estate being 1,115 acres valued at $22,350,000

b.  Real estate being 592 acres valued at $17,100,000

c.  Interests of MA BB Owen, LP valued at $4,033,295.97

MA BB Owen made loans to MA BBO Five in the amount of $4,033,295.97 the detailed back-up for this loan amount is outlined in Exhibit "H".

The Debtor can further define such assets as follows:  See response below.

The values placed on such assets were determined as follows: The values used in our plan were derived from the appraisals ordered by Hillcrest Bank and Heritage Land Bank respectively. A synopsis of the appraisals is as follows: The summary excerpts from the original appraisals are attached as Exhibit "I".

| Trinity Falls Appraisal Synopsis | | | | | |
|---|---|---|---|---|---|
| Property | Bank | Description | Appraiser | Value | Appraisal Date |
| MA BB Owen | Hillcrest Bank Heritage | 1,113.08 acres | CBRE | $22,350,000 | 5/15/2011 |
| MA BBO Five, LP | Bank Heritage | 158.524 acres | Jackson Claborn, Inc. | 5,300,000 | 10/30/2009 |
| MA BBO Five, LP | Bank Heritage | 209.102 acres | Jackson Claborn, Inc. | 7,400,000 | 10/30/2009 |
| MA BBO Five, LP | Bank | 225.021 acres | Jackson Claborn, Inc. | 4,400,000 | 10/30/2009 |
| | Total Acres | 1705.7 | Total Value | $39,450,000 | |

Heritage may want to seek its own opinion of the value of the Debtor's assets.

Hillcrest claims MA BB Owen, L.P. has no equity in its property. The Debtor disagrees. Hillcrest has a May 2011 appraisal that indicates that there is equity in the property.

## Personal Property

4.02   The Debtor has prepared this Analysis based on its opinion of the value of the assets and it matches the numbers used in its Schedules filed with this Court. There is no current appraisal on the assets.

MA-BBO Five, LP

| | | |
|---|---|---|
| Bank Account | $ | 16.99 |
| | | |
| Claims and Causes of Action | Unknown | |

MA BB Owen, LP

| | | |
|---|---|---|
| Bank Account | $ | 196.04 |
| Interests | $4,033,295.97 | |
| Account Receivable | $ | 250.00 |
| Claims and Causes of Action | Unknown | |

## Liquidation Value of Assets

In a liquidation the properties both would sell for less than the secured debts given today's market conditions and the costs of sale. The secured debt exceeds the value of the properties. So the unsecured creditors could expect no return in liquidation unless something could be recovered on the Bank claims described in the Schedules.

MA-BBO Five, LP Property     Value $7,500,000.00      Secured Debt $47,921,717.92
MA BB Owen, LP Property      Value $14,500,000.00     Secured Debt $36,535,238.91

The analysis is based on offers already received by Hillcrest bank from Castle Hills to purchase the notes.

## ARTICLE V.

### SUMMARY OF THE PLAN

### DESIGNATION OF CLASSES OF CLAIMS AND INTERESTS

The Debtors designate the following Classes of Claims and Interests pursuant to Bankruptcy Code Section 1123. The Debtors shall pay all fees assessed by the Office of the United States Trustee until this Case is closed by the Court or the Debtors are otherwise released from such obligations by the Court.

A.  Class 1 consists of any Allowed Administrative Claims of MA-BBO FIVE, LP.

B.  Class 1A consists of any Allowed Administrative Claims of MA BB OWEN, LP.

C.  Class 2 consists of any Allowed Secured Tax Creditor Claims of MA-BBO FIVE, LP.

D.  Class 2A consists of any Allowed Secured Tax Creditor Claims of MA BB OWEN, LP.

E.  Class 3 consists of any Allowed Priority Creditor Claims of MA-BBO FIVE, LP.

F.  Class 3A consists of any Allowed Priority Creditor Claims of MA BB OWEN, LP.

G.  Class 4 consists of Allowed Secured Claim of Heritage Land Bank, ACA ("Heritage") in the MA-BBO FIVE, LP case.

**H.**     <u>Class 5</u> **consists of Allowed Secured Claim of Hillcrest Bank ("Hillcrest") in the MA-BBO FIVE, LP case.**

**I.**     <u>Class 5A</u> **consists of Allowed Secured Claim of Hillcrest Bank ("Hillcrest") in the MA BB OWEN, LP case.**

**J.**     <u>Class 6</u> **consists of Allowed Secured Claim of Parkwood Real Estate Partners, LLC ("Parkwood") in the MA-BBO FIVE, LP case.**

**K.**     <u>Class 6A</u> **consists of Allowed Secured Claim of Parkwood Real Estate Partners, LLC ("Parkwood") in the MA BB OWEN, LP case.**

**L.**     <u>Class 7</u> **consists of Allowed Secured Claim of Tri-Properties, Ltd. ("Tri-Properties") in the MA-BBO FIVE, LP case.**

**M.**     <u>Class 7A</u> **consists of Allowed Secured Claim of Tri-Properties, Ltd. ("Tri-Properties") in the MA BB OWEN, LP case.**

**N.**     <u>Class 8</u> **consists of Allowed Claim of BB Owen Properties, L.P. ("BB Owen").**

**O.**     <u>Class 9</u> **consists of Allowed Claim of Marlin Atlantis White, Ltd. ("MAW").**

**P.**     <u>Class 10</u> **consists of the Allowed General Unsecured Non-Insider Claims in the MA-BBO FIVE, LP case.**

**Q.**     <u>Class 10A</u> **consists of the Allowed General Unsecured Non-Insider Claims in the MA BB OWEN, LP case.**

**R.**     <u>Class 11</u> **consists of the Allowed General Unsecured Insider Claims in the MA-BBO FIVE, LP case.**

**S.**     <u>Class 11A</u> **consists of the Allowed General Unsecured Insider Claims in the MA BB OWEN, LP case.**

**T.**     <u>Class 12</u> **consists of the Equity Holders in the Debtors.**


<u>**PROVISIONS FOR SATISFACTION OF CLAIMS AND INTERESTS**</u>

The Claims and Interests classified in Article IV hereof shall be treated in the manner set forth in this Article V.

U.     <u>Class 1</u> <u>Claims</u>.  The Class 1 Claims will be paid in full by the Debtors the later of the Effective Date or within ten days of becoming an Allowed Claim. These claims are priority

claims pursuant to Section 507(a)(1) of the Bankruptcy Code. These claims include claims for Debtors' attorney's fees and U.S. Trustee's fees. U.S. Trustee's fees must continue to be paid until the case is closed. The Debtors must file quarterly reports following confirmation and until the case is closed. The Class 1 Claims may agree to a different treatment.

V.     Class 1A Claims.  The Class 1A Claims will be paid in full by the Debtors the later of the Effective Date or within ten days of becoming an Allowed Claim. These claims are priority claims pursuant to Section 507(a)(1) of the Bankruptcy Code. These claims include claims for Debtors' attorney's fees and U.S. Trustee's fees. U.S. Trustee's fees must continue to be paid until the case is closed. The Debtors must file quarterly reports following confirmation and until the case is closed. The Class 1A Claims may agree to a different treatment.

W.     Class 2 Claims.  The Allowed Claims under Class 2 shall be paid in full 30 days following the Effective Date. Ad valorem real property taxes for 2011 will be paid when due. The Class 2 Claims shall accrue interest from the Petition Date at the rate of 1% per month from the Petition Date through the Effective Date of the Plan. From and after the Effective Date such claims shall be payable with interest at the rate of 12% per annum. These creditors shall retain their senior liens to secure their claims until paid in full under this Plan. In the event that the Debtors dispute such claim, the payments will be applied to the undisputed amount of the claim as ultimately allowed. While resolution of any such objection is pending, payments pursuant to the Plan shall be applied to the undisputed portion of the claim as ultimately allowed. In the event of a default under the plan, counsel for holder of a claim in this class shall provide notice of the default via facsimile to counsel for the debtor. Such default shall be cured within 15 business days of the date of transmission of such notice of default. In the event the default is not cured, the Claimant shall be entitled to pursue all amounts owed pursuant to state law outside of the Bankruptcy Court. The Claimant shall only be required to provide two notices of default. Upon a third event of default, the Claimant shall be entitled to collect all amounts owed pursuant to state law outside of the Bankruptcy Court without further notice. Failure to pay post-petition taxes prior to delinquency shall constitute an event of default. These claims are secured claims. These creditors shall retain their liens to secure their claims until paid in full under this Plan. Sections 8.02 and 10.07 of the Plan shall not apply to this Class of Secured Claims. The taxes may be paid sooner if there is a sale or refinance of the property securing such claims. Taxes for the current year shall be escrowed with Wells Fargo in the tax escrow account on a monthly basis starting on the Effective Date and shall be paid along with the mortgage payment at the rate of 1/12 per month.

The Class 2 Claims are Impaired and the holders of the Class 2 Claims are entitled to vote to accept or reject the Plan.

X.     Class 2A Claims.  The Allowed Claims under Class 2A shall be paid in full 30 days following the Effective Date. Ad valorem real property taxes for 2011 will be paid when due. The Class 2A Claims shall accrue interest from the Petition Date at the rate of 1% per month from the Petition Date through the Effective Date of the Plan. From and after the Effective Date

such claims shall be payable with interest at the rate of 12% per annum. These creditors shall retain their senior liens to secure their claims until paid in full under this Plan. In the event that the Debtors dispute such claim, the payments will be applied to the undisputed amount of the claim as ultimately allowed. While resolution of any such objection is pending, payments pursuant to the Plan shall be applied to the undisputed portion of the claim as ultimately allowed. In the event of a default under the plan, counsel for holder of a claim in this class shall provide notice of the default via facsimile to counsel for the debtor. Such default shall be cured within 15 business days of the date of transmission of such notice of default. In the event the default is not cured, the Claimant shall be entitled to pursue all amounts owed pursuant to state law outside of the Bankruptcy Court. The Claimant shall only be required to provide two notices of default. Upon a third event of default, the Claimant shall be entitled to collect all amounts owed pursuant to state law outside of the Bankruptcy Court without further notice. Failure to pay post-petition taxes prior to delinquency shall constitute an event of default. These claims are secured claims. These creditors shall retain their liens to secure their claims until paid in full under this Plan. Sections 8.02 and 10.07 of the Plan shall not apply to this Class of Secured Claims. The taxes may be paid sooner if there is a sale or refinance of the property securing such claims. Taxes for the current year shall be escrowed with Wells Fargo in the tax escrow account on a monthly basis starting on the Effective Date and shall be paid along with the mortgage payment at the rate of 1/12 per month.

The following ad valorem taxes are owed on the properties:

See Exhibit "J" which indicates the tax through May 2011 for the MA BBO Owen and MA BBO Five Properties

The Class 2A Claims are Impaired and the holders of the Class 2A Claims are entitled to vote to accept or reject the Plan.


Y.      Class 3 Claims. The Class 3 Claims will be paid once Allowed over five (5) years with interest on such amounts at the rate of 4.5% per annum until paid in full. The payments shall be made in equal monthly payments commencing on the first day of the month following the Effective Date and shall continue on the first day of each month thereafter until paid in full.

The Class 3 Claims are Impaired and the holders of the Class 3 Claims are entitled to vote to accept or reject the Plan.

Z.      Class 3A Claims. The Class 3A Claims will be paid once Allowed over five (5) years with interest on such amounts at the rate of 4.5% per annum until paid in full. The payments shall be made in equal monthly payments commencing on the first day of the month following the Effective Date and shall continue on the first day of each month thereafter until paid in full.

The Class 3A Claims are Impaired and the holders of the Class 3A Claims are entitled to vote to accept or reject the Plan.

AA. Class 4 Claim.  The Class 4 Claim will be paid, , as follows:

The Allowed Secured Claim of Heritage, which the Debtor asserts is approximately $11,700,000.00 (without late fees) but shall include interest at the contract rate and reasonable attorney's fees, shall be amortized over a period of forty (40) years with interest on such amount at a rate of 2.5% with an additional 2.5% interest paid at maturity.  For example: if during the term of the note, $4 million dollars has been paid in interest, then another $4 million dollars will be paid when the loan is paid off. The payments shall be made in equal monthly payments commencing on the first day of the month following the Effective Date and shall continue on the first day of each month thereafter for 120 months following the Effective Date, at which the full unpaid principal balance and accrued unpaid interest shall be paid in full ("Balloon Payment"). The Debtor shall deposit one year's principal and interest into an Interest Reserve Account at a third party bank to cover the payments called for by the Plan for the 12 months following the Confirmation Date.  All phases will be released for the payment of $12,500 per acre paid to the Bank.

All payments made to Heritage during the pendency of this Case shall be applied to the principal portion of the Allowed Claim amount.

Debtor shall meet all financial reporting requirements provided by the current loan documents; *provided, however*, the Debtor's loan with Heritage will not be callable or put in default as a result of the financial condition of any guarantor of the Debtor's obligations to Heritage.

To the extent that a portion of Heritage's claim is unsecured, then such claim shall be treated in Class 9 of the Plan.

Payments shall be due on the first day of the month following the Effective Date as defined in the Plan and shall continue on the first day of each month thereafter until paid in full as set forth in paragraph a. above.

The security interest and liens granted to Heritage under the pre-Petition Date loan documents shall constitute valid and duly perfected security interests and liens. Heritage shall not be required to file, record or serve any financing statements, mortgages, notice or other documents which may otherwise be required under federal or state law in any jurisdiction or to take any other action (including the taking of possession) to validate or perfect such post-petition security interest and liens.  If Heritage shall, in its discretion, elect for any reason to file any such financing statements, mortgages, notices or other documents with respect to such security interests and liens, or take any other action to evidence or perfect same, the Debtor is

authorized and required to, or cause to be executed, all such financing statements, deeds of trust, notices or other documents upon Heritage's request.  Heritage may, in its discretion, file a copy of either the Order Confirming Plan or the Plan in any filing or recording office in any jurisdiction in which the Debtor may have an interest in property and, in such event, the subject filing or recording officer is authorized and directed to file or record such certified copy of either the Order Confirming Plan or the Plan in accordance with applicable law.

Confirmation of the Plan shall be deemed to have cured all pre-confirmation defaults under the Debtor's pre-Petition Date loan documents with Heritage.  The terms of the Heritage pre-Petition Date loan documents are not modified by the Plan or Confirmation Order unless specifically stated in the Plan or confirmation order. Accordingly, the Heritage pre-Petition Date loan documents are enforceable against the Debtor except as specifically stated herein.  In the event of a default by Debtor in its obligations to Heritage under the Plan which is not timely cured within the notice period, Heritage's rights under the pre-Petition loan documents shall be fully enforceable.  If requested by Heritage, Debtor shall execute all necessary loan and related documents with the terms stated in this Plan. Any default in payment shall require a ten day written notice of default and opportunity to cure.

Should this Section of the Plan for treatment of Heritage's Claim contradict any other provision in the Plan, the provisions of this Section shall control.

The Class 4 Claim is Impaired and the holder of the Class 4 Claim is entitled to vote to accept or reject the Plan.

BB.    Class 5 Claim.  The Class 5 Claim will be paid, as follows:

The Allowed Secured Claim of Hillcrest, which the Debtor asserts is approximately $17,477,000.00(without late fees) but shall include interest at the contract rate and reasonable attorney's fees, shall be amortized over a period of forty (40) years with interest on such amount at a rate of 2.5% with an additional 2.5% interest paid at maturity.  For example: if during the term of the note, $4 million dollars has been paid in interest, then another $4 million dollars will be paid when the loan is paid off. The payments shall be made in equal monthly payments commencing on the first day of the month following the Effective Date and shall continue on the first day of each month thereafter for 120 months following the Effective Date, at which the full unpaid principal balance and accrued unpaid interest shall be paid in full ("Balloon Payment"). The Debtor shall deposit one year's principal and interest into an Interest Reserve Account at a third party bank to cover the payments called for by the Plan for the 12 months following the Confirmation Date.  All phases will be released for the payment of $12,500 per acre paid to the Bank.

All payments made to Hillcrest during the pendency of this Case shall be applied to the principal portion of the Allowed Claim amount.

Debtor shall meet all financial reporting requirements provided by the current loan documents; *provided, however*, the Debtor's loan with Hillcrest will not be callable or put in default as a result of the financial condition of any guarantor of the Debtor's obligations to Hillcrest.

To the extent that a portion of Hillcrest's claim is unsecured, then such claim shall be treated in Class 9 of the Plan.

Payments shall be due on the first day of the month following the Effective Date as defined in the Plan and shall continue on the first day of each month thereafter until paid in full as set forth in paragraph a. above.

The security interest and liens granted to Hillcrest under the pre-Petition Date loan documents shall constitute valid and duly perfected security interests and liens. Hillcrest shall not be required to file, record or serve any financing statements, mortgages, notice or other documents which may otherwise be required under federal or state law in any jurisdiction or to take any other action (including the taking of possession) to validate or perfect such post-petition security interest and liens. If Hillcrest shall, in its discretion, elect for any reason to file any such financing statements, mortgages, notices or other documents with respect to such security interests and liens, or take any other action to evidence or perfect same, the Debtor is authorized and required to, or cause to be executed, all such financing statements, deeds of trust, notices or other documents upon Hillcrest's request. Hillcrest may, in its discretion, file a copy of either the Order Confirming Plan or the Plan in any filing or recording office in any jurisdiction in which the Debtor may have an interest in property and, in such event, the subject filing or recording officer is authorized and directed to file or record such certified copy of either the Order Confirming Plan or the Plan in accordance with applicable law.

Confirmation of the Plan shall be deemed to have cured all pre-confirmation defaults under the Debtor's pre-Petition Date loan documents with Hillcrest. The terms of the Hillcrest pre-Petition Date loan documents are not modified by the Plan or Confirmation Order unless specifically stated in the Plan or confirmation order. Accordingly, the Hillcrest pre-Petition Date loan documents are enforceable against the Debtor except as specifically stated herein. In the event of a default by Debtor in its obligations to Hillcrest under the Plan which is not timely cured within the notice period, Hillcrest's rights under the pre-Petition loan documents shall be fully enforceable. If requested by Hillcrest, Debtor shall execute all necessary loan and related documents with the terms stated in this Plan. Any default in payment shall require a ten day written notice of default and opportunity to cure.

Should this Section of the Plan for treatment of Hillcrest's Claim contradict any other provision in the Plan, the provisions of this Section shall control.

The Class 5 Claim is Impaired and the holder of the Class 5 Claim is entitled to vote to accept or reject the Plan.

5.09    Class 5A Claim.  The Class 5A Claim will be treated as set forth above for the Class 5 Claim.

5.10 Class 6 Claim.  The Class 6 Claim will receive no payment under this Plan. Its Allowed Claim shall be converted to equity in the Reorganized Debtor as provided in Section 5.12 below.

The Class 6 Claim is Impaired and the holder of the Class 6 Claim is entitled to vote to accept or reject the Plan.

5.11 Class 6A Claim.  The Class 6A Claim will receive no payment under this Plan. Its Allowed Claim shall be converted to equity in the Reorganized Debtor as provided in Section 5.12 below.

The Class 6A Claim is Impaired and the holder of the Class 6A Claim is entitled to vote to accept or reject the Plan.

5.12 Class 7 Claims.  The Class 7 Claim will receive no payment under this Plan. Its Allowed Claim shall be converted to equity in the Reorganized Debtor as provided in Section 5.12 below.

The Class 7 Claim is Impaired and the holder of the Class 7 Claim is entitled to vote to accept or reject the Plan.

5.13 Class 7A Claims.  The Class 7A Claim will receive no payment under this Plan. Its Allowed Claim shall be converted to equity in the Reorganized Debtor as provided in Section 5.12 below.

The Class 7A Claim is Impaired and the holder of the Class 7A Claim is entitled to vote to accept or reject the Plan

5.14 Class 8 Claim.  The Class 8 Claim will receive no payment under this Plan. Its Allowed Claim shall be converted to equity in the Reorganized Debtor as provided in Section 5.12  below.

The Class 8 Claim is Impaired and the holder of the Class 8 Claim is entitled to vote to accept or reject the Plan.

5.15 Class 9 Claim.  The Class 9 Claim will receive no payment under this Plan. Its Allowed Claim shall be converted to equity in the Reorganized Debtor as provided in Section 5.12 below.

The Class 9 Claim is Impaired and the holder of the Class 9 Claim is entitled to vote to accept or reject the Plan.

5.16  Class 10 Claims.  The Class 10 Claims will be paid as follows:  In full on the Effective Date.

The Class 10 Claims are Impaired and the holder of the Class 10 Claims are entitled to vote to accept or reject the Plan.

5.17  Class 10A Claims.  The Class 10A Claims will be paid as follows:  In full on the Effective Date.

The Class 10A Claims are Impaired and the holder of the Class 10A Claims are entitled to vote to accept or reject the Plan.

5.18  Class 11 Claims.  The Class 11 Claims will receive no payment under this Plan.

The Class 11 Claims are Impaired and the holder of the Class 11 Claims are entitled to vote to accept or reject the Plan.

5.19  Class 11A Claims.  The Class 11A Claims will receive no payment under this Plan.

The Class 11A Claims are Impaired and the holder of the Class 11a Claims are entitled to vote to accept or reject the Plan.

5.20    Class 12 Equity Interest Holders in the Debtors.

The equity interests in the Reorganized Debtors shall be cancelled on Confirmation. The new equity interests in the Debtors shall be restructured into member units in a new limited liability company ("Newco") which shall take title to the Debtors' assets subject to the liens, claims and encumbrances already existing against the  Properties. Newco shall be owned as follows:

(a) Parkwood Real Estate Partners, LLC shall hold 25.84% of  Newco's member units in exchange for its release of the secured note;
(b)  Tri-Properties Limited shall hold 6.46% of  Newco's member units in exchange for its release of its secured note;
(c) Marlin Atlantis White, Ltd. shall hold 5.7% of  Newco's member units in exchange for its release of its secured note for their future work in managing the project;
(d)  BB Owen Properties, LP shall hold 2% of  Newco's member units in exchange for its release of its unfunded Sellers' note;
(e)  The New Capital Partner shall hold 60% of Newco's member units in exchange for such equity investment.


The Equity Interest Holders are Impaired under the Plan.


 The administrative claims include the following:  UST fees $2,100.00 and legal fees for Debtors' counsel $25,000.00.

The claimants in Classes 2 and 2A and 3 and 3A are described as follows:  Class 2 and 2A would be real property taxes owed on the property. Class 3 and 3A are priority creditor claims which there should be none.


# ARTICLE VI

## MEANS FOR IMPLEMENTATION OF PLAN

**6.01    Implementation of Plan**.  This Plan will be implemented, pursuant to § 1123(a)(5) of the Code, by the commencement of payments as called for above.


# ARTICLE VII

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**7.01** <u>**Rejection of Executory Contracts and Unexpired Leases.**</u> Debtors shall assume, pursuant to Bankruptcy Code Section 1123(b)(2), all unexpired leases of real property and executory contracts not specifically assumed or rejected prior to the Confirmation Date. Including without limitation:

Debtor MA-BBO Five, LP and Debtor MA BB Owen, LP shall assume, as of the Confirmation Date, the Development Agreement entered into by the Debtor MA-BBO Five, LP, Debtor MA BB Owen, LP, and the City of McKinney in December 2006.

Debtor MA BB Owen, LP shall assume, as of the Confirmation Date, the Park Development and Disbursement Agreement, entered into by Debtor MA BB Owen, LP and the City of McKinney on or about April 3, 2007.

**7.02.** <u>**Reservation of Rights**</u>. The Debtor shall have the right to assume or reject, pursuant to Bankruptcy Code Section 365, prior to the Confirmation Date, any executory contract or unexpired lease of real property (to the extent permitted under the Bankruptcy Code) and to the terms of this Plan.

**7.03.** <u>**Bar Date for Claims Based on Rejection**</u>. If the rejection of an executory contract or an unexpired lease by the Debtor results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be forever barred and shall not be enforceable against the Debtor or their properties or agents, successors, or assigns, unless a proof of Claim is filed with the Bankruptcy Court and served upon the Debtor, by the earlier of (a) the end of the month following the period in which the Effective Date occurs or (b) such other deadline as the Court may set for asserting a Claim for such damages. Any Rejection Claim arising from the rejection of an unexpired lease or executory contract shall be treated as a General Unsecured Claim; *provided, however*, that any Rejection Claim based upon the rejection of an unexpired lease of real property either prior to the Confirmation Date or upon the entry of the Confirmation Order shall be limited in accordance with section 502(b)(6) of the Bankruptcy Code and state law mitigation requirements. Nothing contained herein shall be deemed an admission by the Debtor that such rejection gives rise to or results in a Claim or shall be deemed a waiver by the Debtor of any objections to such Claim if asserted.

## ARTICLE VIII.

## <u>FEASIBILITY OF PLAN</u>

8.01.    **Debtor** asserts that its **Plan** is feasible based on ***Exhibits "A", "B", "C","D"***

and the detailed market evaluation report prepared by Robert Charles Lesser & Company.  See

the summary overview letter below.  The full market evaluation report is attached as Exhibit "G".



May 10, 2011

Mr. Jim Baker                                                                                    07-11171.08
President
MARLIN ATLANTIS
Galleria Tower II
13455 Noel Road, 23rd Floor
Dallas, Texas 75240

SUBJECT:     Update of Residential Market Opportunity Assessment for the Development of
             the Trinity Falls Master Planned Community (MPC); McKinney, Texas.

Dear Jim:

In October of 2010, Marlin Atlantis engaged RCLCO to update our 2008-2009 market analysis and development program recommendations for Trinity Falls with regard to the product program, market positioning, timing, and absorption, as well as to provide market-driven residential lot values based on a residual land analysis.  This update is reflected in the October 2010 report and is summarized below.

Based on our recent analysis, RCLCO believes that Trinity Falls' anticipated market entry of late 2012 to early 2013 appears to be well-supported based upon the best available market and economic knowledge.  RCLCO's assessment of the viability of Trinity Falls' proposed market entry timing is based on the following factors:

- *Housing Market Indicators*: Though sales slowed significantly in the market in 2009-2010, Dallas' and McKinney's housing market fundamentals still remain among the strongest in the nation in 2011.  As the Dallas housing market cooled in late 2008, national homebuilders had already dialed back production in Dallas given more severe issues in other markets across the country.  As a result, permits and new home deliveries in Texas began to decelerate, which allowed new home production to stay in balance with significantly reduced demand as a result of the subprime mortgage crisis and national recession.  Though Dallas is not immune to continuing macroeconomic pressures affecting other markets, the housing-specific concerns most rampant nationally, e.g. gluts in home and lot inventory, and foreclosures, are not major concerns to development in McKinney, though other areas of Dallas are experiencing these issues.

- *Competitive Analysis*: As Stonebridge Ranch approaches build-out (to date, all lots have been sold to end users or builders), and most major additions to the competitive supply focus on either "drive-for-value" appeal (subdivisions with limited to no community amenities) or niche markets, Trinity Falls remains positioned to act as Stonebridge's successor, both in concept and market share.  Trinity Falls, like Stonebridge Ranch, will be a comprehensive, well-executed and amenitized master plan with a broad range of

housing products appealing to a broad range of buyers, thereby allowing it to achieve high levels of absorption.

- *Socioeconomic Indicators*: Dallas employment growth peaked in 2006 and posted a 3.7% decline in 2009; however, the employment picture in Dallas is less dire than in most other metros. In fact, Dallas experienced very employment growth in 2010 and is projected to approach 2006 levels in 2012, with even strong employment gains expected in 2013-2014. Collin County fares even better than Dallas overall and experienced minimal job losses in 2009. Over the past decade, McKinney and Collin County have evolved into diversified economies with high quality jobs, further propelling growth in the area as new residents are attracted to housing closer to their employers. Though the recession slowed job growth, and therefore household growth, over the past two years, we anticipate Collin County will experience significant household growth through 2020, generating healthy demand for new housing units.

- *Site and Location Analysis*: Trinity Falls' location along the I-75 corridor within the McKinney ETJ places it in Dallas' preferred path of growth. Infrastructure additions, such as Route 121, and the expansion and addition of employment cores closer to the subject site have increased Trinity Falls' viability as a high-performing master planned community.

Assuming no additional major, unanticipated market or economic shocks, and the high quality development plan Marlin Atlantis has in place, RCLCO believes that Trinity Falls' concept and performance projections represent a viable outline for success. Specifically:

- Trinity Falls' master plan offers a well-segmented, but still market-driven, residential program and includes four distinct neighborhood types – Family/Park Neighborhood, Conservation Neighborhood, Traditional Neighborhood Design (TND), and an Active Adult Community (AAC) – appealing to a range of buyer types identified in the McKinney submarket. Changes to the program originally conceived in 2008 include:

  o We assume the age-oriented neighborhood to be driven by demand from Collin County), rather than from the region. This results in a much smaller program that is likely more integrated into the MPC. We don't believe this precludes potential opportunities to sell bulk land to an AAC developer.

  o The product program overall better reflects observed demand by price point, while still adhering to the requirement to have a mean and median lot size of 7,200 SF. It delivers a moderately greater share of lots 50' and below, resulting in a greater number of units priced below $300,000.

  o The product program also delivers a greater number and proportion of the largest category of lots (100'). This greater proportion helps increase the average lot size, and also aims to capture the limited, but also potentially underserved, demand for prices over $500,000.

  o Based on our review of the comparable and competitive supply, we increased unit sizes by approximately 10% from the previous program. In addition to being more consistent with product offerings in the area, we believe these slightly higher unit sizes will be more market-appropriate in Trinity Falls' location.

  o The increase in home size somewhat counterbalances the overall decrease in pricing. The overall price per square foot decreased from $126 to $118 (decline of 6%). The increased unit sizes, however, increased the weighted average home price by 3%.



- The recommended product program includes a wide range of product types and price points from townhomes to 100' single family lots.

  - Home sizes range from 1,300 to 4,400 square feet, with an average size of 2,714 square feet.

  - Home prices range from $172,000 to $635,000, with 75% of the housing products in the $200,000 to $400,000 price range – the area of greatest projected demand – with over 90% of homes falling within Fannie Mae conforming loan standards.

- Average lot values are $57,600 (approximately $1,000 per front foot)[1]; this reflects a 5-6% price reduction since the recession.

- Of the roughly 8,500 annual new housing units demanded in Collin County between 2012 and 2020, we anticipate Trinity Falls to capture up to nearly 500 units per year (ranging from nearly 200 sales in the first year and peaking near 500). This range represents a 4.3% share of the Collin County market (on average) for the life of the project, which is below Stonebridge Ranch's 6.3% market share it maintained from 1998-2009.

Assuming the Dallas economy continues to grow jobs in 2011, McKinney will likely require new lot inventory by mid 2012, and new home inventory in 2011. This is fairly consistent with RCLCO's "prolonged recession scenario" analyzed in the spring of 2009, which assumed the recession would largely impact housing demand through 2010, slowing both lot demand and delivery.

Sincerely,

Todd LaRue, Project Director

Principal
RCLCO

---

[1] 2010 $'s. Average lot values include more expensive products to be introduced in later phases; starting average lot values for family/parks neighborhood are approximately $938/FF in 2010$ (before any premiums).

**RCLCO**
ROBERT CHARLES LESSER & CO.

**Procedure for Filing Proofs of Claims and Proofs of Interests**

8.02.    All proofs of claims and proofs of interests must be filed by those **Claimants** and **Equity Interest Holder** who have not filed such instruments on or before the **Bar Date** fixed by the **Court**.

8.03.    If **Claimants** have already filed a proof of claim with the **Court** or are listed in the **Debtor**'s Schedules as holding non-contingent, liquidated and undisputed claims, a proof of claim need not be filed.  The schedules and amendments thereto are on file with the **Court** and are open for inspection during regular **Court** hours.  If the equity security interest of an **Equity Interest Holder** is properly reflected in the records of the **Debtor**, a proof of interest need not be filed.

# ARTICLE IX.

## ALTERNATIVES TO DEBTOR'S PLAN

9.01.    If the **Debtor**'s **Plan** is not confirmed, the **Debtor**'s bankruptcy case may be converted to a case under Chapter 7 of the **Code**, in which case a trustee would be appointed to liquidate the assets of the **Debtor** for distribution to its **Creditors** in accordance with the priorities of the **Code**.   Since the Debtor's assets are subject to liens that there would be little or no distribution to unsecured creditors in Chapter 7.

# ARTICLE X.

## RISKS TO CREDITORS UNDER THE DEBTOR'S PLAN

10.01.    **Claimants** should be aware that there are a number of substantial risks involved in consummation of the **Plan**.  The **Plan** contemplates that the **Debtor'**s business will generate revenue sufficient to pay the obligations accruing from its operations.   The **Debtor** does not "guarantee" that the expenses will equal those in the projections; however, the **Debtor** believes that the projections are reasonable.

Care has been taken in developing the plan to mitigate risk to the creditors.  The Plan and the Project proforma are derivatives of the extensive Market Evaluation for Trinity Falls completed in October 2010 by Robert Charles Lesser & Company (See Exhibit "G"). The primary conclusions, which follow, are indicated in the Market Evaluation and are in support of developing Trinity Falls and introducing it to market per our Plan. As one could assume, the only major risk that we could see for the creditors is that of an substantially extended continuation of the recession that adversely affect the Texas, Collin County and specifically the McKinney sub market.



## PRIMARY CONCLUSIONS

- RCLCO's analysis recommends a broad segmentation of quality home products to be offered at Trinity Falls. Projected housing demand and competitive supply trends in the Primary and Competitive Market Areas support the specific recommended product types and mix.

- Lot inventory conditions, as well as economic and household growth, accommodate introducing Trinity Falls in mid-to-late 2012 or early 2013.

- Even as its growth rate moderates from the previous two decades, Collin County will continue to experience significant household growth through 2020, generating healthy demand for new housing units.

- Of the roughly 8,500 annual new housing units demanded in Collin County between 2010 and 2020, we anticipate Trinity Falls to capture up to 492 units per year.

- Even with a location on the edge of the Metroplex, Trinity Falls should achieve attractive end-user and lot pricing through superior MPC quality and execution.

- Despite moderately decreased home prices, declines in construction costs have maintained lot prices at average levels similar to our previous study – slightly above $1,000 per front foot overall.

RCLCO
ROBERT CHARLES LESSER & CO

2

07-11171.00

## XI.

## TAX CONSEQUENCES TO THE DEBTOR

TO ENSURE COMPLIANCE WITH U.S. TREASURY DEPARTMENT CIRCULAR 230, HOLDERS OF CLAIMS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF UNITED STATES FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED OR RELIED UPON, AND CANNOT BE USED OR RELIED UPON, BY HOLDERS OF CLAIMS OR INTERESTS OR ANY OTHER PERSONS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS OF CLAIMS OR ANY OTHER PERSONS UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS INCLUDED HEREIN IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF U.S. TREASURY DEPARTMENT CIRCULAR 230) OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISER.

A. Introduction

The following discussion summarizes certain material U.S. federal income tax consequences of the Plan to the Debtor and holders of Claims and Interests. The summary is provided for general informational purposes only and is based on the United States Internal Revenue Code of 1986, as amended (the "Tax Code"), the treasury regulations promulgated thereunder, judicial authority and current administrative rulings and practice, all as in effect as of the date hereof (except as otherwise noted below with regard to the American Recovery and Reinvestment Act of 2009), and all of which are subject to change, possibly with retroactive effect. Changes in any of these authorities or in their interpretation could cause the United States federal income tax consequences of the Plan to differ materially from the consequences described below. The United States federal income tax consequences of the Plan are complex and in important respects uncertain. No ruling has been requested from the Internal Revenue Service (the "Service"); no opinion has been requested from Debtor's counsel concerning any tax consequence of the Plan; and no tax opinion is given by this Disclosure Statement.

The following discussion does not address all aspects of federal income taxation that may be relevant to a particular holder of a Claim or Interest in light of its particular facts and circumstances or to particular types of holders of Claims subject to special treatment under the Tax Code. For example, the discussion does not address issues of concern to broker-dealers or other dealers in securities, or foreign (non-U.S.) persons, nor does it address any aspects of state, local, or foreign (non-U.S.) taxation, or the taxation of holders of Interests in a Debtor. In addition, a substantial amount of time may elapse between the Confirmation Date and the receipt of a final distribution under the Plan. Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, court decisions or administrative changes, could affect the federal income tax consequences of the Plan and the transactions contemplated hereunder.

On February 13, 2009, the House of Representatives and the Senate passed H.R.1, the American Recovery and Reinvestment Act of 2009 (the Recovery Act), a stimulus bill that includes tax breaks for businesses and individuals. The President signed the Recovery Act on February 17, 2009. The following discussion does not address any aspects of the Recovery Act, some of which may be relevant to a particular holder of a Claim or an Interest.

**THE DISCUSSION THAT FOLLOWS IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND PROFESSIONAL TAX ADVICE BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH ITS TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

B. Certain Definitions
Except as expressly otherwise provided or unless the context otherwise requires, all capitalized

terms not otherwise defined herein or in the Plan shall have the respective meanings assigned to them in this Article.

"**COD**" shall mean cancellation of indebtedness income.
"**NOL**" shall mean net operating loss.

C. Certain Material Federal Income Tax Consequences to the Debtor

Cancellation of a Debtor's debt is generally taxable income to the Debtor. COD is the amount by which the indebtedness of a Debtor discharged exceeds any consideration given in exchange therefore. Cancellation of a debt may not necessarily be COD, however. To the extent that the Debtor is insolvent, or if the Debtor is in bankruptcy, as is the case here, the Tax Code permits the Debtor to exclude the COD from its gross income. The statutory exclusion for COD in a title 11 case generally excludes COD from gross income if the discharge is granted by a court to a Debtor under its jurisdiction in a title 11 case, as is sought herein.

The price for the bankruptcy COD exclusion (as well as the insolvency exclusion) is reduction of the Debtor's tax attributes to the extent of the COD income, generally in the following order: NOLs for the year of the discharge and NOL carryovers from prior years; general business tax credit carryovers; minimum tax credit available as of the beginning of the year following the year of discharge; net capital loss for the year of discharge and capital loss carryovers from prior years; basis of the Debtor's assets; passive activity loss and credit carryovers from the year of discharge; and foreign tax credit carryovers to or from the year of discharge. The reduction of attributes does not occur until after the end of the Debtor's tax year in which the COD occurred, so they are available to the Debtor in determining the amount of its income, loss and tax liability for the year of discharge.

As a result of the implementation of the Plan, the Debtors will have COD and potential attribute reduction. Because any reduction in tax attributes does not effectively occur until the first day of the taxable year following the taxable year in which the COD is incurred, the resulting COD, on its own, should not impair the ability of the Debtor to use their tax attributes (to the extent otherwise available) to reduce their tax liability, if any, otherwise resulting from the implementation of the Plan.

Under section 382 of the Tax Code, if a corporation undergoes an "ownership shift," the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation. Although the Plan allows for an ownership change it is doubtful that one will occur and as such any owner of the Debtor should consult his own tax adviser concerning the effect of the Plan.

The United States federal income tax consequences of payment of Allowed Claims pursuant to the Plan will depend on, among other things, the consideration received, or deemed to have been received, by the holder of the Allowed Claim, whether such holder reports income on the accrual

or cash method, whether such holder receives distributions under the Plan in more than one taxable year, whether such holder's Claim is allowed or disputed at the Effective Date, whether such holder has taken a bad debt deduction or worthless security deduction with respect to its Claim.

In general, a holder of a Claim should recognize gain or loss equal to the amount realized under the Plan in respect of its Claim less the amount of such holder's basis in its Claim. Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Claim and the holder, the length of time the holder held the Claim and whether the Claim was acquired at a market discount. If the holder realizes a capital loss, its deduction of the loss may be subject to limitations under the Tax Code. The holder's aggregate tax basis for any property received under the Plan generally will equal the amount realized. The amount realized by a holder generally will equal the sum of the cash and the fair market value of any other property received (or deemed received) by the holder under the Plan on the Effective Date and/or any subsequent distribution date, less the amount (if any) allocable to Claims for interest. All holders of Allowed Claims are urged to consult their tax advisors. A holder of a Claim constituting an installment obligation for tax purposes may be required to recognize currently any gain remaining with respect to the obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold or otherwise disposed of within the meaning of Section 453B of the Tax Code.

D. Importance of Obtaining Professional Tax Assistance

The foregoing discussion is intended only as a summary of certain U.S. federal income tax consequences of the Plan, and is not a substitute for careful tax planning with a tax professional. The above discussion is for general information purposes only and is not tax advice. The tax consequences are in many cases uncertain and may vary depending on a holder's individual circumstances.

HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.

## ARTICLE XII.

## PENDING LITIGATION

11.01.    As of the date of the filing of this Disclosure the significant matters pending are as follows: None.

# ARTICLE XIII.

## SUMMARY OF SIGNIFICANT ORDERS ENTERED DURING THE CASE

12.01.  As of the date of the filing of this Disclosure the following significant orders have been entered in this case: Applications to Employ Professionals.


**Respectfully Submitted:**

By: /s/ Joyce Lindauer
Joyce Lindauer
Attorney at Law
Texas Bar No. 21555700
8140 Walnut Hill Lane
Suite 301 Dallas, TX  75231
Tel: (972) 503-4033
Fax: (972) 503-4034
**COUNSEL FOR THE DEBTORS**


**/s/ John Marlin**
Managing Member of the Debtors,
Corporate General Partners